**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

|  |  |
|---|---|
| REPEAT PRECISION, LLC, | |
| *Plaintiff*, | Civil Action No. 6:19-cv-36 |
| v. | |
| DIAMONDBACK INDUSTRIES, INC., | |
| *Defendant*. | |

**COMPLAINT**

Plaintiff Repeat Precision, LLC ("Repeat Precision") files this Complaint for patent infringement, breach of contract, antitrust violations, tortious interference, and declaratory judgment against Defendant Diamondback Industries, Inc. ("Diamondback").

## I.      INTRODUCTION

1.      Repeat Precision sells products and provides machining services in the oil and gas industry.   Diamondback is the assignee of United States Patent No. 9,810,035 ("the '035 Patent"),[1] titled "Disposable Setting Tool," which includes 20 patent claims for a disposable setting tool used in oil and gas completion operations.   As claimed in the '035 patent and in operation, the disposable setting tool uses a power charge.   Because Diamondback did not have the facilities or resources to produce the disposable setting tool on a large-scale basis, Diamondback contracted for Repeat Precision to manufacture and sell the tool under an exclusive license to the '035 patent.   In return, Diamondback received the benefit of royalties on Repeat Precision's sales, as well as additional revenues from selling Diamondback's

---

[1] A true and correct copy of the '035 Patent is attached as Exhibit A.

Eliminator™ power charges, which buyers had to purchase in order to use the disposable setting tool.

2.    The parties' rights and obligations relating to the disposable setting tool and the '035 Patent are set forth in the Patent License Agreement dated March 16, 2018,[2] as amended on May 30, 2018[3] (collectively, the "License").   Under the License, Repeat Precision has the "exclusive right and license under the Licensed Patents to make, have made, use, offer to sell, sell, import or export" the "Licensed Products."  Ex. B at ¶2.  "Licensed Products" are defined as "an electric wireline setting tool used for well completions … the manufacture, use, offer for sale, sale or importation of which would, but for this Agreement, infringe a Valid Claim" under the '035 Patent.  Ex. C at ¶2.1.

3.    Relying on the License and the ability of its disposable setting tool customers to purchase Diamondback's Eliminator™ power charges, Repeat Precision invested millions of dollars in manufacturing facilities and equipment to build the tool.  Repeat Precision has begun to manufacture and sell disposable setting tools, directing customers to also purchase Diamondback's Eliminator™ power charge.  *See, e.g.*, Ex. D (brochure for the PurpleSeal Express™).

4.    Repeat Precision intended to sell its disposable setting tool for use with Diamondback's Eliminator™ power charge, and Diamondback knew that at the time of contracting.  Repeat Precision needed access to a functioning power charge in order for it to receive the value and benefits it contracted to receive under its license with Diamondback.  Diamondback's Eliminator™ power charge is the only commercially-available power charge on the market that works with a disposable setting tool.  Diamondback is the exclusive assignee of

---

[2] A true and correct copy of the March 16, 2018 Patent License Agreement is attached as Exhibit B.
[3] A true and correct copy of the May 30, 2018 Amendment to Patent License Agreement and Right of First Refusal Agreement is attached as Exhibit C.

two United States patents relating to power charges, which help it exclude others from competing against it in the power charge market.

5.    In contradiction of Repeat Precision's exclusive right to make and sell the disposable setting tool and in breach of the License, Diamondback has made (or has contracted with another entity to make) a disposable setting tool covered by the '035 patent, which Diamondback is selling in the market in competition with Repeat Precision.

6.    In view of Diamondback's breach of the License and other disputes between the parties, Repeat Precision filed suit against Diamondback in Houston.[4]  Diamondback retaliated by refusing to sell power charges to the customers of Repeat Precision who purchase disposable setting tools from Repeat Precision.  Diamondback sales personnel explained to Repeat Precision's customers that the only way to obtain the power charges needed to run the disposable setting tool was to buy the tool from Diamondback.  Diamondback's actions constitute an unlawful tying of one product (the power charge) to the sale of another (the disposable setting tool), with an intent to harm competition in the disposable setting tool market.  Diamondback's retaliatory refusal to sell to Repeat Precision customers is an illegal monopolization or an attempt to illegally monopolize the disposable setting tool market.  Diamondback's actions are an attempt to recapture the rights Diamondback previously conveyed to Repeat Precision under the License.

7.    Diamondback and Repeat Precision agreed to a mutual stand-down period, during which the parties would negotiate to try to resolve their disputes.  Diamondback agreed to sell its Eliminator™ power charges to Repeat Precision customers during that stand-down period.  In the interest of cooperation, Repeat Precision agreed to dismiss its Houston lawsuit, further

---

[4] *See* Case No. 4:18-cv-04456, *Repeat Precision, LLC v. Diamondback Industries, Inc.*, in the U.S. District Court for the Southern District of Texas, Houston Division.

agreeing to Diamondback's request for a Waco forum if further litigation was needed. The parties' efforts to resolve this dispute during the stand-down period failed. As a result, Repeat Precision is once again operating under Diamondback's threat to withhold the sale of its Eliminator™ power charges to Repeat Precision customers.

8.     Repeat Precision seeks recovery of actual and compensatory damages against Diamondback arising out of its infringing sales, of disposable setting tools, its breach of the License, and its unlawful commercial activities, including treble damages for willful patent infringement, as well as treble damages under Section 4 of the Clayton Act and Section 15.21(a) of the Texas Free Enterprise and Antitrust Act of 1983 for the time periods when Diamondback has engaged, or is engaging, in antitrust violations. Repeat Precision further seeks injunctive relief to prohibit Diamondback from continuing its patent infringement, further breaching the License, and from engaging in its anticompetitive conduct (both during and after this suit) by refusing to sell power charges to Repeat Precision's customers. Although Repeat Precision's preference is for it and its customers' properly-licensed contractors to be able to purchase the Eliminator™ power charges for the disposable setting tool from Diamondback, given Diamondback's disruption of that supply for an essential and necessary product, Repeat Precision also seeks declaratory relief recognizing that the License grants Repeat Precision the alternative right to make or have made power charges.

## II.     PARTIES

9.     Repeat Precision is a Texas limited liability company with its principal place of business located at 19450 State Hwy 249, Ste. 200, Houston, Texas 77070.

4

10.     On information and belief, Diamondback is a Texas corporation with its headquarters and principal place of business located at 3824 Williamson Road, Crowley, Texas 76036.

### III.     JURISDICTION AND VENUE

11.     Repeat Precision asserts claims for patent infringement against Diamondback arising under the patent laws of the United States, Title 35 of the United States Code, and for antitrust violations against Diamondback arising under the antitrust laws of the United States, Title 15 of the United States Code.  Accordingly, this Court has jurisdiction over the subject matter of this action under at least 28 U.S.C. §§ 1331, 1337, 1338, and 1367.

12.     This Court has personal jurisdiction over Diamondback because it is a resident of the State of Texas and has purposefully availed itself of the privileges of conducting business in the State of Texas and in this District.  Diamondback has also submitted to the jurisdiction of this Court under the Agreement signed by Diamondback's authorized representative on January 8, 2019.

13.     Venue is proper in the Western District of Texas under at least 28 U.S.C. § 1391(b) because, on information and belief, a substantial part of Diamondback's infringing activities giving rise to the claims herein occurred in this District.  Additionally, venue is proper in the Western District of Texas, Waco Division, because Diamondback specifically consented to jurisdiction and venue in this Court in the January 8, 2019 Agreement.

### IV.     FACTUAL BACKGROUND

**A.     Overview of the Use of Setting Tools and Frac Plugs in Well Completions**

14.     Repeat Precision was formed in 2017 to, among other things, manufacture and sell frac plugs.  Frac plugs are used during the completion of oil and gas wells to isolate specific

zones within the well, particularly when the operator is perforating various zones within the well. It is common for there to be multiple completion zones within a well, with horizontal wells having many more zones than vertical wells. A frac plug is used to enable the operator to focus on a particular zone for completion, without adversely impacting the work that has already been performed further down the well (*i.e.* towards its "toe" or bottom hole location), by sealing off the lower sections.

15.     Setting tools are used to place the frac plug in the desired location within the wellbore. Installing a frac plug requires the use of a setting tool. The frac plug is attached to a setting tool prior to being inserted into the wellbore. That assembly (*i.e.* the setting tool and frac plug) usually includes additional equipment, such as perforation guns that are used to shoot holes into the well casing and surrounding structure to enable sand and water to be injected into the reservoir and allow hydrocarbons to subsequently flow into the well. The pieces of the assembly are combined at the surface of the well, usually by a wireline company contracted by the operator to perform this work. When inserted into the wellbore, the frac plug goes first, followed by the setting tool that is attached to the frac plug, followed by the perforation guns attached to the tool. These assemblies are typically limited to 30 feet in length.

16.     Using a traditional setting tool, the tool assembly must be inserted, removed, broken down, and reassembled for the well at each stage of completion in a multi-zoned well. For horizontal wells, this can be a repetitive and time consuming process, as wells often have up to ninety different stages, and perhaps many more. Even with well-qualified operators, and assuming all goes well, the process of setting the frac plug in place is time intensive. It could take 30 minutes to pump the setting tool assembly in place to set the frac plug, another 45 minutes to remove the assembly from the well, and (when conventional setting tools are used) 45

minutes to break down and reassemble the setting tool assembly needed for the next completion. When using conventional tools, this is also a labor intensive process.

17.     When a frac plug reaches its correct location within the wellbore, the setting tool is activated to set the plug.  This is done using a power charge installed within the setting tool, which is operated by electric switches via a wireline back to the controllers at the surface.  Once the power charge activates, the explosive force applied to the setting tool forces the plug into place within the wellbore, blocking off the lower zones in the wellbore.

18.     If the setting process goes wrong, it can have severe negative consequences to the well.  For example, if a "mis-run" occurs, meaning that the plug reaches the correct location in the wellbore but the setting tool fails to function when attempting to place the plug, it is necessary to remove the entire setting tool assembly, bring the plug to the surface, and redo the entire process—costing operators valuable time.  If there is a "pre-set," meaning the plug is set in the well at the wrong location, but is successfully detached from the setting tool, it is usually necessary to use a workover rig to drill out and remove that plug—costing the operator time delays and extra costs that could be $60,000 or more for the workover rig.  If there is a "soft-set," meaning that the plug is not set at the right location and fails to detach from the setting tool assembly, it is necessary to retrieve the entire setting tool assembly from the well by "fishing"— which can cost the operator extensive monetary damages and delays, and could even result in the loss of the well.  Some attempts to fish out a soft-set plug and assembly have taken over a month, or failed entirely.

**B.    Conventional Setting Tools**

19.     Conventional setting tools have been used in the well completion process for decades.  Conventional setting tools are designed to be used multiple times.

20.     The original type of conventional setting tool (which is still commonly used today), is approximately 72 inches long, weighs about 153 pounds and requires a manual pressure release of gas at the surface.  There are health and safety risks associated with the manual pressure release, as the laborer who operates the bleed valve is required to straddle the pressure valve at the top of the wellbore and may be exposed to the gases escaping from the well when the pressure is manually released.

21.     Another type of conventional setting tool is often referred to as the "Shorty" or "Compact."  They are approximately 40 inches long, and weigh about 76 pounds, but do not require manual pressure release at the surface.

22.     All of these conventional setting tools require disassembly and rebuilding after each use—*i.e.* after the frac plug is set for each stage of production.  Done correctly, the setting tool is completely disassembled and cleaned to remove fluids and residue after every use.  It is then reassembled.  The most commonly used conventional setting tools require approximately 20 O-rings for assembly.   With the number of screws, O-rings, and other parts involved in reassembly, the risk of error is significant.  And if the conventional setting tool is not correctly rebuilt, it can cause mis-runs, pre-sets, and soft-sets.

23.     When an operator or wireline company cuts corners, and fails to do the full disassembly, cleaning, and rebuilding of the conventional setting tool before its next use, it greatly increases the risk of problems, and can have severe negative consequences.

## C.     The Disposable Setting Tool

24.     The disposable setting tool is a major innovation.  It performs the same function as a conventional setting tool—*i.e.* setting frac plugs in place.  But it is significantly different.  It is shorter, lighter, and less expensive.  And it is assembled in a factory, minimizing the risk of

error in the field because it does not need to be rebuilt or cleaned in the field. It also saves labor costs, in the field, as laborers are not required to break-down, clean, and rebuild the setting tool assembly for each stage.

25.    On November 7, 2017, the United States Patent and Trademark Office issued the '035 Patent, titled "Disposable Setting Tool," which listed as the inventors Derrek D. Drury, Jimmy L. Carr, and Trea H. Baker. The '035 Patent was assigned by the listed inventors to Diamondback. On information and belief, the '035 Patent is currently in full force and effect.

26.    Diamondback has explained the benefits of the disposable setting tool as compared to conventional tools, as follows:

> The present invention provides advantages of a low cost setting tool which may be disposed of after one use. Since the tool is dry fired, without use of a hydraulic fluid such as oil, the tool may be disposed of without requiring tearing down of the tool for removal of hydraulic fluids. The disposable setting tool also eliminates rebuilding of the setting tool for later use, reducing risks the tool not being properly rebuilt during field dressing and eliminating the labor costs for field operators to field dress the tool.

Ex. A at 017-018. There are other benefits too. For example, because of its design and manufacturing, the disposable setting tool has a significantly decreased risk of mis-runs, soft-sets, or pre-sets, which could cause significant damage to a well. Operators using the disposable setting tool face a significantly decreased risk of injury because, unlike many conventional tools, the disposable tool does not require a manual pressure release at the surface of the well. Moreover, because the disposable setting tool is much smaller (only 25-26 inches) and lighter (weighing about 20 lbs.) than conventional tools, it takes fewer people to handle and operate, and it can be used with additional guns or weight bars compared to the heavier conventional tools.

27.    Repeat Precision sells the PurpleSeal Express™ system—a streamlined frac plug installation tool that combines Repeat Precision's PurpleSeal™ frac plug with an improved version of Diamondback's super short (or SS) disposable setting tool. The PurpleSeal Express

is, in itself, a further innovation in the market, eliminating one step in the field assembly process—the combining of the setting tool and the frac plug.

28.     Repeat Precision has also sold a version of its SS disposable setting tool as a standalone product.

29.     By selling the PurpleSeal Express™ system and the standalone SS disposable setting tools in accordance with its License from Diamondback, Repeat Precision has expanded the potential market for Diamondback to sell its power charges.  The PurpleSeal Express™ system and the standalone disposable setting tools sold by Repeat Precision were designed to be used with Diamondback's Eliminator™ power charge.

30.     The improved Repeat Precision version of the disposable setting tool, like the SS disposable setting tool Diamondback introduced into the market, is designed to be used with a dry fired power charge, and unlike conventional setting tools, it does not use a hydraulic fluid, such as oil.  The inexpensive materials and simplistic machining used to make the SS disposable setting tool enable the disposable nature of the tool.

31.     Since its introduction to the oil and gas industry, the disposable setting tool, including Repeat Precision's PurpleSeal Express™ and the standalone SS disposable setting tools Repeat Precision makes in accordance with its License from Diamondback, have rapidly gained market acceptance for well completions.  There were over 500,000 stages completed in the last year.  On information and belief, disposable setting tools were used in approximately 20-30% of those completions.  This percentage will continue to grow rapidly if Repeat Precision is able to continue to move forward with its sales and production efforts.

**D.     The License**

32.     Diamondback's president and majority shareholder, Derrek Drury, has publicly

admitted that one reason Diamondback entered into the License, and amended it in May 2018, was to "ramp up" production and sale of the disposable setting tool.[5]  Repeat Precision had the ability to do this.  The License was therefore a win-win opportunity for Diamondback and Repeat Precision.  Repeat Precision was able to produce, market, and sell the disposable setting tool for a profit.  Diamondback received an upfront payment for the License, as well as a per-sale royalty.  Ex. B at ¶¶4.1 & 4.2.  Diamondback also earned profits by selling Diamondback's Eliminator™ power charge to each Repeat Precision customer that purchased the disposable setting tool from Repeat Precision.

33.    The claims in the '035 Patent expressly include "a power charge."  (*E.g.*, Claim 1 of the '035 Patent, Col. 7, line 50).

34.    The License, as reflected in its plain language, intended that Repeat Precision had all of the patent rights that it needed or were useful for it to manufacture and sell the disposable setting tool for the parties' mutual benefit.  Thus, in the License, Diamondback "represents and warrants that

> (a)  The patents and patent applications of the Licensed Patent are all the patents, and patent applications owned by Licensor, or in which Licensor has a licensable interest, that are necessary or useful for Licensee to make, have made, use, offer to sell, sell, and import the Licensed Products in the Territory."

Ex. B at ¶9.2.

35.    Diamondback also agreed to "perform such other acts as may be necessary to give full effect to the terms of this Agreement."  Ex. B at ¶13.3.

---

[5] *See* Declaration of Derrek Drury dated November 1, 2018, at ¶6, filed in Case No. 4:18-cv-00902-A, *Diamondback Industries, Inc. v. Repeat Precision, LLC*, in the U.S. District Court for the Northern District of Texas, Fort Worth Division.

36.     Diamondback's refusal to sell power charges to Repeat Precision customers undermines the purposes of the License, and is the opposite of performing "such other acts as may be necessary to give full effect to the terms of this Agreement."  Ex. B at ¶13.3.

**E.      The Power Charges**

37.     Diamondback is currently the only entity that makes and sells power charges that may be used in a disposable setting tool.  Other traditional power charges, such as those used in conventional tools, are not a substitute.  The use of a power charge in the disposable setting tool is expressly disclosed in Claims 1, 10, and 18 of the '035 Patent.

38.     The '035 patent, in the "Summary of the Invention" section, discloses that the power charge used in the claimed gas operated setting tool "is dry fired in the disposable setting tool, that is, the setting tool does not use hydraulic fluid such as oil between pistons as does convention [sic] setting tool, allowing for disposal of the disposable setting tool without the need to recover oil prior to disposal."  (Col. 2, lines 19-24 of the '035 patent).

39.     Diamondback has obtained patents relating to its power charge products.  On September 27, 2016, the United States Patent and Trademark Office issued United States Patent issued No. 9,453,382 B2 ("the '382 Patent"),[6] entitled "Power Charge Igniter Having a Retainer Protrusion" to the listed inventors Derrek D. Drury, Jimmy L. Carr, Robert Andres and Trea H. Baker.  On October 23, 2018, the United States Patent and Trademark Office United States issued Patent No. 10,107,054 B2 ("the '054 Patent"),[7] entitled "Power Charge Having a Combustible Sleeve" to the listed inventors Derrek D. Drury, Jimmy L. Carr, Robert Andres and Trea H. Baker.  On information and belief, the '382 and '054 patents were assigned by the listed inventors to Diamondback.

---

[6] A true and correct copy of the '832 Patent is attached as Exhibit E.
[7] A true and correct copy of the '054 Patent is attached as Exhibit F.

40.     The '832 and '054 Patents disclose Diamondback's dry-fired power charges and disclose the materials for the preferred methods of making the charges.

41.     Diamondback knew that the '382 patent had issued on September 27, 2016 when it entered into the License on March 16, 2018.  Diamondback knew that the patent application leading to the issuance of the '054 patent was pending when it entered into the License.

42.     At the time it entered into the License, Diamondback knew that the '382 patent and the pending application for the '054 patent were "necessary or useful for Licensor to make, have made, use, offer to sell, sell, and import the Licensed Products in the Territory" as provided for in Section 9.2 of the License.

**F.      Diamondback's Refusal to Sell the Eliminator™ Power Charges**

43.     Based on the License, Repeat Precision should be the only party manufacturing or selling disposable setting tools in the disposable setting tool market.  That is the result compelled by the exclusive rights under the '035 Patent, which were licensed exclusively to Repeat Precision.  Nevertheless, in breach of the License, Diamondback is selling a disposable setting tool that infringes the '035 patent and directly competes with Repeat Precision's product. Diamondback and Repeat Precision are the only two sellers in the disposable setting tool market. There is currently no other disposable setting tool in the market.  The exclusive license under the '035 Patent gives Repeat Precision the right to exclude Diamondback and others from selling disposable setting tools.

44.     Prior to November 26, 2018, which is the date when Repeat Precision first sued Diamondback for breaching its license, Diamondback sold its power charges to all those who had purchased disposable setting tools, regardless of whether the customer purchased the product from Repeat Precision or from Diamondback.  On information and belief, Diamondback dealt

with customers seeking to purchase its Eliminator™ power charges for use in disposable setting tools on equal footing, with terms dictated by market conditions.

45.     On Friday, November 30, 2018, Repeat Precision learned that Diamondback was refusing to sell power charges to companies that purchased disposable setting tools from Repeat Precision.  Repeat Precision was first contacted about this issue from a wireline company ("Customer A") that had purchased approximately $140,000 in standalone disposable setting tools over a two month period in September and October 2018.  Customer A purchased an additional $30,000 of standalone disposable setting tools from Repeat Precision in November 2018.  When Customer A attempted to purchase the necessary power charges from Diamondback, Diamondback's representative asked where Customer A obtained the disposable setting tools.  Upon learning the source was Repeat Precision, Diamondback refused to sell the necessary charges to Customer A because of litigation between Diamondback and Repeat Precision. Diamondback thereby breached the License and also interfered with Repeat Precision's contractual relationship and future business relationship with the customer.  As a result of Diamondback's actions, Repeat Precision was forced to pick up the unused disposable setting tools from Customer A, giving it a credit.  Repeat has since learned that Diamondback further took advantage of this opportunity, by making sales to Customer A with power charges, thereby stealing Repeat Precision's business opportunity.

46.     On Tuesday, December 4, 2018, Repeat Precision was contacted by one of its largest disposable setting tool customers, Customer B, who Diamondback also denied the opportunity to purchase the power charges that are needed to run the tools.  Diamondback's representative told this customer that it was trying to "stick it to Repeat" and to "force Repeat out of the market."  Diamondback further told the customer that if it wanted to purchase power

charges from Diamondback, the customer would need to enter into an exclusive agreement to purchase its disposable setting tools only from Diamondback.  Diamondback therefore breached the License and also interfered with Repeat Precision's contractual relationship and future business relationship with the customer.

47.     A rational competitor would want to maximize its profits from sales.  Given the growing consumer acceptance of disposable setting tools manufactured by Repeat Precision, it is economically irrational for Diamondback to refuse to sell power charges to Repeat Precision's customers.  The only logical explanation for Diamondback's behavior is that Diamondback is using its position as the only supplier of power charges that will work on the disposable setting tool to foreclose competition in the market for disposable setting tools.  This ultimately harms customers and competition in the disposable setting tools market because customers are either (a) denied access to the disposable setting tools, which are more cost effective, and less risky than traditional setting tools, or (b) forced to deal with a supplier other than the one they would have chosen under normal market conditions.  This conduct will harm a substantial amount of competition, and, if allowed to continue, raises a dangerous risk that Diamondback will unlawfully monopolize the disposable setting tool market.

48.     Withholding access to the necessary power charges for use by Repeat Precision and its customers is the opposite of providing Diamondback's patented technologies "that are necessary or useful for Licensor to make, have made, use, offer to sell, sell, and import the Licensed Products in the Territory."  Ex. B at ¶9.2.  Given that the power charges are essential to make the disposable setting tool work, they are both "necessary" and "useful" for Repeat to make, sell, and use the Licensed Products.

# V.    CAUSES OF ACTION

## *Count 1: Patent Infringement*

49.    Repeat Precision incorporates by reference Paragraphs 1 through 48 above.

50.    In the interest of providing detailed averments of infringement, Repeat Precision has identified below one exemplary claim to demonstrate infringement by two exemplary Diamondback products.  However, the selection of the exemplary claim and exemplary products should not be considered limiting, and any additional infringing Diamondback products or services and infringed claims of the '035 Patent will be disclosed in discovery.

51.    On information and belief, Diamondback has provided and currently provides super short (or SS) disposable setting tools, including the SS10 and SS20 tools shown in Exhibit G attached hereto ("Diamondback Setting Tools").  Diamondback also has provided and currently provides power charges that are used in various setting tools, such as the Diamondback Setting Tools ("Diamondback Power Charges").  Together, the Diamondback Setting Tools and Diamondback Power Charges (collectively, the "Diamondback Accused Products") directly infringe one or more claims of the '035 Patent.

52.    The Diamondback Accused Products include a mandrel having a first section, an intermediate section, and a second (or lower) section.  The first section of the mandrel is defined for securing a firing head thereto.  The mandrel also contains an upper end with a seal section for securing to the firing head.  The mandrel further has a lowermost end that is adapted for securing to a packer mandrel.

53.    The intermediate section of the mandrel of the Diamondback Accused Products has an interior bore extending from the first section of the mandrel to a blind end of the interior bore, which defines a power charge chamber.  The Diamondback Accused Products have one or

16

more flow ports that extend radially outward from the power charge chamber through the mandrel to an exterior of the intermediate section of the mandrel.  Intermediate section of the mandrel of the Diamondback Accused Products defines an intermediate exterior of a first uniform circumference.

54.     The second section of the mandrel of the Diamondback Accused Products has a lower exterior of a second uniform circumference that is in fluid communication with the interior bore of the intermediate section of the mandrel.  The second uniform circumference of the lower exterior of the second section is smaller than the first uniform circumference of the intermediate exterior of the intermediate section.

55.     The Diamondback Accused Products include a barrel piston having a tubular body with an enclosed end and a central portion with a uniform interior circumference for slidably receiving the intermediate section and the second section of the mandrel.  The enclosed end of the tubular body has a bore for slidably receiving the second section of the mandrel.  The barrel piston further has a lowermost end that is adapted for securing to a setting sleeve.

56.     The Diamondback Accused Products include an annular-shaped space that extends between the central portion of the tubular body of the barrel piston and the second section of the mandrel.

57.     The Diamondback Accused Products include a first seal extending between the tubular body of the barrel piston and the intermediate section of the mandrel for sealing a first portion of the annular-shaped space.

58.     The Diamondback Accused Products also include a second seal extending between the bore in the enclosed end of the barrel piston and the second section of the mandrel for sealing a second portion of the annular-shaped space.

59.     The Diamondback Accused Products include a power charge that is disposed in, or capable of being disposed in, the power charge chamber of the intermediate section of the mandrel.  The power charge of the Diamondback Accused Products may be ignited to generate pressurized gas that is passed through the one or more flow ports to stroke the barrel piston over the second section of the mandrel, thereby moving a setting sleeve relative to a packer mandrel and setting a well tool secured thereto.

60.     The Diamondback Setting Tools include a mandrel, a barrel piston, a first seal, a second seal, and all elements of the foregoing as described above.  The Diamondback Power Charge includes a power charge that is capable of being disposed in the power charge chamber of the Diamondback Setting Tools and ignited to generate pressurized gas as described above.

61.     As described above, the Diamondback Accused Products practice all limitations of one or more claims of the '035 Patent, including claim 1.

62.     Diamondback has directly infringed and currently directly infringes one or more claims of the '035 Patent, including claim 1, by at least: (1) making the Diamondback Accused Products at its facilities in Crowley, Texas after the execution of the Amendment, and upon information and belief, having the Diamondback Accused Products made abroad for importation and sale within the United States; (2) offering the Diamondback Accused Products for sale at several technical conferences after the execution of the Amendment, including the 2018 Society of Petroleum Engineers Annual Technical Conference & Exhibition in Dallas, Texas, from September 24-26, 2018, and the 2018 DUG Midcontinent Conference & Exhibition in Oklahoma City, Oklahoma, from November 13-15, 2018; (3) offering the Diamondback Accused Products for sale through its website, as shown in Exhibit G, after the execution of the Amendment; (4) on information and belief, selling the Diamondback Accused Products to customers in the Western

District of Texas after the execution of the Amendment; and (5) on information and believe, importing the Diamondback Accused Products.

63.     Diamondback has been aware of the '035 Patent since at least its issuance and has induced infringement and continues to induce infringement of the '035 Patent.  Diamondback sells and offers for sale the Diamondback Accused Products (or components thereof) to customers with knowledge of the '035 Patent and with the specific intent that the claims of the '035 Patent are infringed by disposing a Diamondback Power Charge (or other suitable power charge) in the power charge chamber of the Diamondback Setting Tools and igniting the power charge to generate pressurized gas that is passed through one or more flow ports of the mandrel of the Diamondback Setting Tools to stroke the barrel piston of the Diamondback Setting Tools over the second section of the mandrel thereby moving a setting sleeve relative to a packer mandrel and setting a well tool secured thereto.

64.     Diamondback has been aware of the '035 Patent since at least its issuance and has contributed to and continues to contribute to the infringement of the '035 Patent by others.  For the reasons described above, the Diamondback Setting Tools of the Diamondback Accused Products are a material part of the invention covered by the claims of the '035 Patent. Diamondback sells and offers for sale the Diamondback Setting Tools to customers knowing that the Diamondback Setting Tools are especially made or especially adapted for use in the infringement of one or more clams of the '035 Patent.  The Diamondback Setting Tools are neither staple articles nor commodities of commerce suitable for substantial non-infringing use because they can only be used in an infringing manner to dispose a Diamondback Power Charge (or other suitable power charge) therein, which is then ignited to generate pressurized gas that is passed through one or more flow ports of the mandrel of the Diamondback Setting Tools to

stroke the barrel piston of the **Diamondback Setting Tools** over the second section of the mandrel thereby moving a setting sleeve relative to a packer mandrel and setting a well tool secured thereto.

65.     Diamondback has been aware of the '035 Patent since its issuance.  Diamondback further has been aware of Repeat Precision's exclusive rights to make, have made, use, offer to sell, sell, import or export Licensed Products under the '035 Patent in the United States (and elsewhere) since granting Repeat Precision those rights in the Amended Patent License Agreement on May 30, 2018.  The Diamondback Accused Products are electric wireline setting tools used for well completions and, as explained above, their manufacture, use, offer for sale, sale, or importation infringe one or more claims of the '035 Patent.  Therefore, the Diamondback Accused Products fall within the scope of Licensed Products as defined in the Amended Patent License Agreement.

66.     Diamondback has made, sold, and offered for sale, and currently makes, sells, and offers for sale, the Diamondback Accused Products (and components thereof) to customers, as discussed above, with knowledge of the '035 Patent and Repeat Precision's exclusive rights under the Amended Patent License Agreement and with the specific intent that one or more claims of the '035 Patent are infringed by the Diamondback Accused Products and use thereof. Diamondback has represented and recognized that Repeat Precision's rights under the '035 Patent are exclusive and nonetheless continues to infringe one or more claims of the '035 Patent.

67.     Diamondback's infringement of the '035 Patent has been and is willful and done deliberately and with full knowledge that the continued manufacture and sale of the Diamondback Accused Products (and components thereof) infringe one or more claims of the

'035 Patent, justifying an increase in damages to be awarded to Repeat Precision up to three times the amount found or assessed in accordance with 35 U.S.C. § 284.

68.     The Diamondback Accused Products compete with one or more products sold by Repeat Precision, including at least the PurpleSeal Express™ system, which includes a version of the Diamondback SS disposable setting tool and uses Diamondback's Eliminator™ power charge.

69.     As a result of Diamondback's infringing acts, Repeat Precision has suffered and continues to suffer damage, including lost profits.  Under 35 U.S.C. § 284, Repeat Precision is entitled to recover damages for Diamondback's infringing acts, which in no event can be less than a reasonable royalty.

70.     Repeat Precision seeks a declaration that this is an exceptional case under 35 U.S.C. § 285, and that the Court award Repeat Precision its reasonable attorneys' fees.

71.     As a result of Diamondback's infringing acts, Repeat Precision has been and continues to be irreparably injured and the remedies available to Repeat Precision at law are inadequate to compensate for that injury.  Repeat Precision's irreparable injury will continue unless and until Diamondback's continuing acts are restrained and enjoined by this Court.

72.     Repeat Precision is entitled to injunctive relief enjoining and restraining Diamondback, its officers, agents, servants, and employees, acting jointly or severally, and all persons acting in concert with it, and each of them, from further infringement of one or more claims of the '035 Patent.

### Count 2: Breach of Contract
### Violation of the Exclusive Rights under the License

73.     Repeat Precision incorporates by reference Paragraphs 1 through 72 above.

74.     On March 16, 2018, Diamondback and Repeat Precision entered into the Patent License Agreement that granted Repeat Precision and its Affiliates "an exclusive right and license under the Licensed Patents," including the '035 Patent, "to make, have made, use, offer to sell, sell, import or export Licensed Products in the Territory," which includes the United States.

75.     On May 30, 2018, Diamondback and Repeat Precision entered into the Amendment, under which Licensed Products is defined to mean "an electric wireline setting tool used for well completions and any other products that may be agreed upon in writing by [Diamondback] and [Repeat Precision] from time to time, the manufacture, use, offer for sale, sale, or importation of which would, but for this Agreement, infringe a Valid Claim in a jurisdiction in the Territory where such a Valid Claim exists."

76.     As explained above, the Diamondback Accused Products are electric wireline setting tools used for well completions and their manufacture, use, offer for sale, sale, or importation infringe one or more claims of the '035 Patent.  Therefore, the Diamondback Accused Products fall within the scope of Licensed Products as defined in the Amended Patent License Agreement.

77.     At all times relevant herein, Diamondback knew of Repeat Precision's exclusive rights under the Amended Patent License Agreement.

78.     Diamondback's past and current manufacture, sale, and offer for sale of the Diamondback Accused Products after execution of the Amendment are material breaches of Repeat Precision's exclusive rights under the Amended Patent License Agreement.

79.     To the extent Diamondback has licensed others to make the Diamondback Accused Products for Diamondback, such conduct is also a breach of the representation in

Paragraph 9.2(e) of the License, in which Diamondback represented that "it has not granted and will not grant any licenses or other contingent or non-contingent right, title, or interest under or relating to the Licensed Patents."

80.     At all times relevant herein, Repeat Precision has performed all of its obligations under the Amended Patent License Agreement.  As such, the Amended Patent License Agreement remains a valid, binding, and enforceable written agreement.

81.     By reason of Diamondback's breaches of the Amended Patent Agreement, Repeat Precision has suffered damages in an amount to be proven at trial.

82.     As a result of Diamondback's breach of the License, Repeat Precision has been and continues to be irreparably injured and the remedies available to Repeat Precision at law are inadequate to compensate for that injury.  Repeat Precision's irreparable injury will continue unless and until Diamondback's continuing acts are restrained and enjoined by this Court.

83.     Repeat Precision is entitled to injunctive relief enjoining and restraining Diamondback, its officers, agents, servants, and employees, acting jointly or severally, and all persons acting in concert with it, and each of them, from further breach of the License.

### *Count 3: Illegal Tying of Disposable Setting Tool and Power Charge Products in Violation of Sherman Act §1, Clayton Act §4, and Texas Free Enterprise and Antitrust Act of 1983 §§15.05(a) & 15.21*

84.     Repeat Precision incorporates by reference Paragraphs 1 through 83 above.

85.     Diamondback has tied its power charge product (tying product) to the purchase of its disposable setting tool product (tied product) by refusing to sell its power charge product to consumers who purchase a disposable tool setting product from Repeat Precision, the only other producer of disposable setting tools in the market.  This anticompetitive behavior constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 3 of the Clayton Act, 15 U.S.C.

§ 14, and Sections 15.05(a) & (c) of the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code § 15.05.

86.     Diamondback is currently the only entity making and selling power charges that can be used with the disposable setting tool.  There are also significant barriers to entry into the power charge market that prevent other potential competitors from entering into this market space for disposable setting tools, including Diamondback's power charge patents and the need for licenses from the Bureau of Alcohol, Tobacco, and Firearms, which can take over a year to obtain.   Thus, because Diamondback is the only source for the necessary power charges, purchasers of disposable setting tools have no choice but to purchase the disposable setting tools from Diamondback, thereby unlawfully excluding the disposable setting tools of Repeat Precision.

87.     Disposable setting tools and power charges are commercially separate and distinct products that are designed to be used together.  There is separate consumer demand for disposable setting tools and power charges, and, prior to Diamondback's unlawful conduct, consumers purchased disposable setting tools and power charges from separate sources.

88.     Diamondback possesses monopoly power in the market for power charges for disposable setting tools because the Diamondback power charge is the only existing power charge that works with disposable setting tools, including the disposable setting tools that are marketed by both Diamondback and Repeat Precision.

89.     Diamondback is leveraging its monopoly power in the market for power charges for disposable setting tools to coerce buyers to purchase its disposable setting tool rather than Repeat Precision's disposable setting tool.  Diamondback's conduct constitutes a *per se* violation

of Section 1 of the Sherman Act and Section 15.05(a) of the Texas Free Enterprise and Antitrust Act.

90.     The tying arrangement affects a substantial volume of commerce in the disposable setting tools market, suppresses the sales of disposable setting tools, suppresses consumer choice within the disposable setting tools market, and diminishes Repeat Precision's current and future sales opportunities.

91.     The tying arrangement constitutes an unreasonable restraint on trade in violation of 15 U.S.C. § 1 and Tex. Bus. & Com. Code §15.05(a).   There are no pro-competitive justifications for Diamondback's behavior.   To the contrary, Diamondback's behavior is economically irrational, including because it is foregoing sales of its power charges to consumers in order to harm competition in the disposable setting tools market, and also foregoing royalties under the License on disposable setting tools that it would have received had Repeat Precision made more sales.

92.     Diamondback's actions are willful and flagrant, and are in retaliation for Repeat Precision exercising its contractual rights under the License.

93.     Diamondback has specifically intended, and continues to intend, through its alleged conduct, to control prices, exclude competitors, and destroy competition in the relevant market for disposable setting tools by leveraging its monopoly power in the market for power charges for disposable setting tools.   Thus, even if Diamondback has through some natural or legal advantage (which is specifically denied) gained monopoly power in the market for power charges for disposable setting tools, it has illegally exploited that position in order to control the market for disposable setting tools.

94.     Repeat Precision has been directly and proximately damaged by losses of sales and profits resulting from Diamondback's unlawful tying of products.  Repeat Precision seeks damages, treble damages, reasonable attorneys' fees, costs of court, and all other relief available to it under the antitrust laws.  *See* 15 U.S.C. §15(a); Tex. Bus. & Com. Code §15.21(a)(1)**.** Repeat Precision (and the market for disposable setting tools) will be irreparably harmed if Diamondback's unlawful tying of products is not enjoined.

95.     As a result of Diamondback's unlawful acts, Repeat Precision has been and continues to be irreparably injured, and the remedies available to Repeat Precision at law are inadequate to compensate for that injury.  Repeat Precision's irreparable injury will continue unless and until Diamondback's continuing acts are restrained and enjoined by this Court.

96.     Repeat Precision is entitled to injunctive relief enjoining and restraining Diamondback, its officers, agents, servants, and employees, acting jointly or severally, and all persons acting in concert with it, and each of them, from further unlawful acts.

### Count 4: Unlawful Attempt to Monopolize
### in Violation of Sherman Act  §2, Clayton Act §4, and
### Texas Free Enterprise and Antitrust Act of 1983 §§15.05(b) & 15.21

97.     Repeat Precision incorporates by reference Paragraphs 1 through 96 above.

98.     Diamondback's conduct is an attempt to monopolize the disposable setting tool market in violation of 15 U.S.C. § 2 and Section 15.05(b) of the Texas Free Enterprise and Antitrust Act of 1983.

99.     Defendant has acted with the specific intent to monopolize the relevant market for disposable setting tools and has sufficient market power to create a dangerous probability of success of monopolizing the market.

100.     Diamondback's actions are willful and flagrant, and are in retaliation for Repeat Precision electing to exercise its contractual rights under the License.

101.     The relevant geographic market is the United States.  The disposable setting tools market is a separate and distinct product market from the market for conventional (i.e. non-disposable) setting tools.  Disposable setting tools can be easily disposed of without dealing with the substantial risks and costs associated with conventional setting tools.  Disposable setting tools are significantly easier to use because, unlike conventional setting tools, they do not need to be disassembled, cleaned, and reassembled for further use, requiring service by trained personnel.  Disposable setting tools are simply disposed of following a single use, significantly reducing the operational and safety risks associated with conventional setting tools.

102.     There are significant barriers to entry to both the disposable setting tool market and the market for power charges for disposable setting tools.  Both products are the subject of one or more patents related to their design, use, or manufacture.  The power charges are subject to governmental regulation by the Bureau of Alcohol, Tobacco and Firearms.  Manufacture of both products requires specialized equipment and expertise.

103.     Diamondback has foreclosed, or attempted to foreclose, competition in the disposable setting tool market by engaging in predatory and anti-competitive conduct, including, as described above, the tying of disposable setting tools to power charges and refusing to sell power charges to consumers who have purchased disposable setting tools from Repeat Precision.

104.     Diamondback's anti-competitive practices have injured competition and consumers in the relevant market for disposable setting tools, suppressed sales of Repeat Precision's products, and diminished Repeat Precision's current and future sales opportunities.

If Diamondback's illegal conduct is not enjoined, the market for disposable setting tools will suffer irreparable harm, through market distortion and coercion of consumer choice.

105.    As a direct and proximate result of Diamondback's anticompetitive conduct alleged herein, Repeat Precision has been injured in its business and property and suffered substantial lost profits.

106.    Repeat Precision seeks damages, treble damages, reasonable attorneys' fees, costs of court, and all other relief available to it under the antitrust laws.  *See* 15 U.S.C. §15(a); Tex. Bus. & Com. Code §15.21(a)(1)**.**  Repeat Precision (and the market for disposable setting tools) will be irreparably harmed if Diamondback's unlawful tying of products is not enjoined.

107.    As a result of Diamondback's unlawful acts, Repeat Precision has been and continues to be irreparably injured, and the remedies available to Repeat Precision at law are inadequate to compensate for that injury.  Repeat Precision's irreparable injury will continue unless and until Diamondback's continuing acts are restrained and enjoined by this Court.

108.    Repeat Precision is entitled to injunctive relief enjoining and restraining Diamondback, its officers, agents, servants, and employees, acting jointly or severally, and all persons acting in concert with it, and each of them, from further unlawful acts.

### *Count 5: Exclusive Dealing in Violation of Clayton Act §§3 & 4, and Texas Free Enterprise and Antitrust Act of 1983 §§15.05(b) & 15.21*

109.    Repeat Precision incorporates by reference Paragraphs 1 through 108 above.

110.    Diamondback has conditioned the purchase of its power charges for disposable setting tools on consumers entering into exclusive contracts with Diamondback for the purchase of its disposable tools.

111.    Diamondback's exclusive dealing constitutes a violation of Section 3 of the Clayton Act, 15 U.S.C. § 14, and Section 15.05(c) of the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code §15.05(c).

112.    If allowed to continue, Diamondback's illegal conduct likely will foreclose Repeat Precision from substantial portions of the market for disposable setting tools and will substantially lessen competition in those markets.    Diamondback's behavior will create or maintain its monopoly and/or market power over the disposable setting tool market.

113.    As a direct and proximate result of Diamondback's anticompetitive conduct alleged herein, Repeat Precision has been injured in its business and property and suffered substantial lost profits, and will suffer irreparable harm if Diamondback is not enjoined from continuing its illegal course of conduct.

114.    Repeat Precision seeks damages, treble damages, injunctive relief, reasonable attorneys' fees, costs of court, and all other relief available to it under the antitrust laws. *See* 15 U.S.C. §15(a); Tex. Bus. & Com. Code §15.21(a)(1)**.**

115.    As a result of Diamondback's unlawful acts, Repeat Precision has been and continues to be irreparably injured, and the remedies available to Repeat Precision at law are inadequate to compensate for that injury.  Repeat Precision's irreparable injury will continue unless and until Diamondback's continuing acts are restrained and enjoined by this Court.

116.    Repeat Precision is entitled to injunctive relief enjoining and restraining Diamondback, its officers, agents, servants, and employees, acting jointly or severally, and all persons acting in concert with it, and each of them, from further unlawful acts.

### *Count 6: Breach of Contract*
### *Refusing to Sell Power Charges to Repeat Precision Customers*

117.    Repeat Precision incorporates by reference Paragraphs 1 through 116 above.

29

118.    Diamondback's refusal to sell power charges to Repeat Precision customers undermines the purposes of the License, is in breach of Paragraph 13.3 of the License, and is in breach of the implied duty to cooperate imposed under Texas law.

119.    In Paragraph 13.3 of the License, Diamondback agreed to "perform such other acts as may be necessary to give full effect to the terms of this Agreement." Ex. B at ¶13.3.  The terms of the License include Repeat Precision's ability "to make, have made, use, offer to sell, sell, import or export" disposable setting tools.  Ex. B at ¶ 2.  By taking action to undermine Repeat Precision's exclusive rights and to prohibit Repeat Precision from receiving the benefit of its rights under the License, Diamondback has breached at least Paragraphs 2 and 13.3.

120.    Moreover, under Texas law, Diamondback has an implied duty to cooperate with Repeat Precision under the License.  Texas law does not allow a party, like Diamondback here, to enter into an agreement, but then take actions to interfere with or prevent the other contracting party from exercising its rights under the agreement.  By refusing to sell power charges to Repeat Precision customers, Diamondback has breached the implied duty to cooperate.

121.    Repeat Precision has been damaged by Diamondback's breach of the License and breach of the implied duty to cooperate.

122.    Diamondback should be compelled to perform the act of selling power chargers to Repeat Precision and/or its customers so as to give full effect to the term of the License.

123.    Repeat Precision therefore seeks an order compelling specific performance by Diamondback to include, for the Term of the License, selling power charges to Repeat Precision and or customers who have or will purchase products from Repeat Precision upon terms that are not materially different than the terms in existence when the License was executed.

***Count 7: Breach of Implied Contract***
***Refusing to Sell Power Charges to Repeat Precision Customers***

124.    Repeat Precision incorporates by reference Paragraphs 1 through 123 above.

125.    Alternatively, if Diamondback's refusal to sell power charges to Repeat Precision customers is not in breach of the License itself, it is in breach of the implied-in-fact contract between Repeat Precision and Diamondback.

126.    When Diamondback began doing business with Repeat Precision, Diamondback knew that it was the only entity that makes and sells power charges that work with the disposable setting tools.   Diamondback conveyed this fact to Repeat Precision on multiple occasions, including early on in the parties' business relationship.   Diamondback was counting on its position as the only supplier of power charges for the disposable setting tool as a way to make money from selling power charges to Repeat Precision's customers.

127.    After entering into the License with Repeat Precision, Diamondback actively encouraged Repeat Precision to produce disposable setting tools and to increase manufacturing capacity.   On many occasions, Diamondback requested Repeat Precision to "ramp up" production of the disposable setting tools.   Not only was Diamondback interested in earning royalties from the sales and selling more power charges, Diamondback had a large backlog of orders from customers who wanted to buy disposable setting tools.   Diamondback needed Repeat Precision to provide the extra manufacturing capacity.

128.    Based on Diamondback's repeated requests to "ramp up" production, Repeat Precision invested millions in manufacturing facilities and personnel to increase the quantity of disposable setting tools available for sale.   Repeat Precision communicated its actions to Diamondback, keeping Diamondback in the loop as Repeat Precision was acquiring a long-term lease for additional manufacturing facilities, purchasing equipment to make the disposable

setting tools, and hiring personnel to operate the new facilities.  Diamondback encouraged this activity to occur.

129.    Diamondback knew that, without access to power charges, Repeat Precision's investments and the License would be rendered worthless.  With Diamondback's permission, Repeat Precision actively promoted the Diamondback power charges for use with Repeat Precision's products.  Diamondback even requested and received opportunities to review and approve some of Repeat Precision's promotional materials before they were used.  In short, through its words and its actions, Diamondback provided assurance to Repeat Precision that power charges would be made available to Repeat Precision customers when Repeat Precision increased its production of disposable setting tools.

130.    Diamondback's assurances of a sufficient source of power charges to support Repeat Precision's increased production of disposable setting tools was consideration for, and a key point relied upon, when Repeat Precision invested millions to expand its manufacturing operations.  This course of conduct created an implied-in-fact contract that Diamondback would continue to make its power charges available to Repeat Precision's customers on commercially-reasonable terms.

131.    On Friday, November 30, 2018, Repeat Precision learned that Diamondback was refusing to sell power charges to customers that purchased disposable setting tools from Repeat Precision.  Diamondback's refusal to sell power charges is in breach of the implied-in-fact agreement.

132.    Repeat Precision has been damaged by Diamondback's breach of the implied-in-fact agreement.  Repeat Precision seeks recovery of its actual damages and attorneys' fees arising out of this breach.

133.    Diamondback should be compelled to perform the act of selling power charges to repeat Precision and/or its customers in accordance with the implied-in-fact agreement between the parties.

134.    Repeat Precision therefore seeks an order compelling Diamondback to continue, for the Term of the License, to sell power charges to Repeat Precision and/or its customers who have or will purchase products from Repeat Precision upon terms that are not materially different than the terms in existence when the License was executed.

### Count 8: Tortious Interference with Existing Contractual Relationships

135.    Repeat Precision incorporates by reference Paragraphs 1 through 134 above.

136.    Repeat Precision entered into an actual contract to sell approximately $30,000 worth of standalone disposable setting tools to Customer A in or about late November 2018. Customer A had previously purchased approximately $140,000 worth of standalone disposable setting tools from Repeat Precision in the prior two months.

137.    After Repeat Precision completed the late November sale to Customer A, Diamondback refused to sell the necessary power charges for Customer A to use the tools, stating that it refused to do so because Customer A had purchased the tools from Repeat Precision.  Diamondback's refusal to sell the power charge was directly intended to interfere with Repeat Precision's contracts with Customer A.

138.    As a direct and proximate result of Diamondback's refusal to sell power charges to Customer A, Diamondback caused Customer A to breach its contract with Repeat Precision and return the disposable setting tools it had purchased from Repeat Precision in December 2018.  Repeat Precision was damaged by this interference with its customer contracts because it was forced to return Customer A's money for that sale.  Repeat Precision has also been damaged

by its lost opportunity for additional sales to Customer A that would have occurred, but for Diamondback's interference. Repeat Precision has since learned that Diamondback further interfered with Repeat Precision's relationship with Customer A, using its control over the power charge market to enable it to sell disposable setting tools to Customer A that otherwise would have been sold by Repeat Precision.

139.    Upon information and belief, Diamondback has actually interfered with, or at least attempted to interfere with, other Repeat Precision customer relationships.

140.    Diamondback's interference with Repeat Precision's customer relationships was intentional and malicious, and in retaliation for Repeat Precision exercising its contract rights under the License. At a minimum, Diamondback was grossly negligent when engaging in this interference and retaliatory conduct. Accordingly, Repeat Precision seeks punitive damages against Diamondback due to its intentional and malicious conduct.

141.    As a result of Diamondback's unlawful acts, Repeat Precision has been and continues to be irreparably injured, and the remedies available to Repeat Precision at law are inadequate to compensate for that injury. Repeat Precision's irreparable injury will continue unless and until Diamondback's continuing acts are restrained and enjoined by this Court.

142.    Repeat Precision is entitled to injunctive relief enjoining and restraining Diamondback, its officers, agents, servants, and employees, acting jointly or severally, and all persons acting in concert with it, and each of them, from further unlawful acts.

### Count 9: Tortious Interference with Prospective Contractual Relationships

143.    Repeat Precision incorporates by reference Paragraphs 1 through 142 above.

144.    Texas law recognizes claims for tortious interference with existing and prospective customer relationships, even when those relationships have not been memorialized in

formal contracts.  *See El Paso Healthcare Sys. Ltd. v. Murphy,* 518 S.W.3d 412, 421 (Tex. 2017); *Heil-Quaker Corp. v. Mischer Corp.,* 863 S.W.2d 210, 214 (Tex. App.—Houston [14th dist.] 1993), writ granted w.r.m., 877 S.W.2d 300 (Tex. 1994); *Whisenhunt v. Lippincott*, 474 S.W.3d 30, 44 (Tex. App.—Texarkana 2015, no pet.); *see also Astoria Indus. v. SNF, Inc.*, 223 S.W.3d 616, 630 & n.54 (Tex. App.—Fort Worth 2007, pet denied) ("The types of business relationships protected against interference include continuing business relationships."); RESTATEMENT (SECOND) TORTS §766B, cmt. c (recognizing that "[t]he expression, prospective contractual relation, is not used in this Section in a strict, technical sense").

145.    Repeat Precision is the manufacturer and seller of disposable setting tools, which, by design, are low-cost products sold to recurring customers.  Repeat Precision has many ongoing customer relationships, which include customers who previously purchased disposable setting tools.  Repeat Precision anticipated it would sell additional disposable setting tools to its prior customers, many of whom have expressed an intent to continue purchasing disposable setting tools from Repeat Precision.

146.    Diamondback has acted (a) with a conscious desire to prevent Repeat Precision from being able to continue its existing customer relationships, (b) with knowledge that disruption and interference with Repeat Precision's customer relationships was substantially certain to occur as a result of Diamondback's conduct, and (c) with malice and in retaliation against Repeat Precision due to Repeat Precision's decision to file suit to protect its rights under the License.  Indeed, the point of Diamondback's anticompetitive conduct was to intentionally disrupt Repeat Precision's customer relationships to try to pressure Repeat Precision into giving up significant rights Repeat Precision had acquired under the License.

147.    Diamondback's conduct was independently tortious and unlawful.  Under Texas law, a party acts in a tortious or unlawful manner when it engages in unfair competition, *see Prudential Insurance Co. of America v. Financial Review Services, Inc.*, 29 S.W.3d 74 (Tex. 2000), which would include the types of antitrust violations and anticompetitive conduct that Diamondback directed at Repeat Precision and its customers, which is detailed above.  But a tortious interference claim sweeps more broadly than the antitrust claims stated above, focusing on whether the conduct at issue (here, Diamondback's) is unlawful, rather than on whether Repeat Precision, as the plaintiff, could independently recover under the antitrust laws.  *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001).  Accordingly, Diamondback's conduct gives rise to liability for tortious interference, regardless of whether Repeat Precision prevails on the merits of its antitrust claims.

148.    Diamondback's tortious and unlawful conduct has been the direct cause of injury and actual damages to Repeat Precision.  By depriving Repeat Precision customers of access to power charges, Repeat Precision has already lost sales of its disposable setting tools, and will continue to lose sales until Diamondback's conduct is stopped.

149.    Repeat Precision seeks recovery of its actual damages as a result of Diamondback's tortious interference, injunctive relief to prevent further interference with Repeat Precision's customers, and exemplary damages because Diamondback has acted with malice and gross negligence towards Repeat Precision.  *See* Tex. Civ. Prac. & Rem. Code §41.003(a).

### *Count 10: Breach of Contract*
### *Breach of the Representation in Paragraph 9.2*

150.    Repeat Precision incorporates by reference Paragraphs 1 through 149 above.

151.    In Paragraph 9.2 of the License, Diamondback "represents and warrants" to Repeat Precision that "[t]he patents and patent applications of the Licensed Patent are all the

patents and patent applications owned by Licensor, or in which Licensor has a licensable interest, that are necessary or useful to License to make, have made, use, offer to sell, sell, and import the Licensed Products in the Territory."  This clause provides assurances to Repeat Precision that Diamondback was not withholding any necessary rights for Repeat Precision to make and sell the disposable setting tools covered by the License.

152.    Because power charges are necessary and useful to the Licensed Products, Diamondback's '382 and '054 Patents for power charges fall squarely within the scope of this clause.  Diamondback knew about the '382 Patent and application pending for the '054 Patent at the time the parties entered into the License.  Thus, Diamondback's representation and warranty in Paragraph 9.2 was false when made, and Diamondback knew it was false.

153.    Repeat Precision has been damaged by Diamondback's breach.  By withholding access to power charges from Repeat Precision's customers (even using its '382 and '054 Patents as a deterrent to having others make power charges for Repeat Precision's disposable setting tools), Diamondback is denying Repeat Precision access to patent rights that are both necessary and useful for Repeat Precision to sell its Licensed Products.

154.    In Paragraph 13.3, Diamondback represented that it would "promptly execute such documents and perform such acts as may be necessary to give full effect to the terms of this Agreement."   Here, the proper remedy for Diamondback's breach of Paragraph 9.2 of the License is to compel Diamondback to execute the necessary documents to expressly grant and confirm that the License also granted Repeat Precision rights under the '382 and '054 Patents and any other patent rights necessary or useful for Repeat Precision to make, have made, use, offer to sell, sell, and import the Repeat Precision disposable setting tool.

155.    In view of its breach of warranty, Diamondback is estopped from arguing that Repeat Precision, its customers, and any third party who makes power charges for Repeat Precision and its customers need a license under any of Diamondback's patent rights in connection with the manufacture, use, or sale of disposable setting tools and the power charges to be used within those tools.

### Count 11: Declaratory Judgment
### Repeat Precision's Right to Make and Sell Power Charges

156.    Repeat Precision incorporates by reference Paragraphs 1 through 155 above.

157.    Repeat Precision seeks declaratory relief under 28 U.S.C. §2201, *et seq.*, to resolve disputes that have arisen between the parties regarding their rights under the License, particularly as related to power charges.

158.    Repeat Precision seeks declarations from this Court that:

a.    Repeat Precision has the right and license to make, have made import, use or sell power charges without infringing Diamondback's patents or other legal rights;

b.    the License grants Repeat Precision the right to make, have made, use, offer for sale, sell, or important in the Territory, the power charges that are necessary or useful for making and using disposable setting tools;

c.    the Licensed Patents under the License include the '382 and '054 Patents;

d.    Diamondback does not have the right to exclude Repeat Precision from the market for power charges for disposable setting tools; and

e.    Repeat Precision's rights under the License include the right to have a third-party make and sell the necessary power charges for use by Repeat Precision's customers, free and clear of any claim of infringement by Diamondback that such activities infringe the Licensed Patents, including the '382 and '054 Patents.

### Count 12: Promissory Estoppel

159.    Repeat Precision incorporates by reference Paragraphs 1 through 158 above.

160.    As an alternative ground for recovery, Repeat Precision should be compensated for its reasonable and substantial reliance on Diamondback's promises.

161.    Diamondback promised it would continuously sell the requisite power charges for the disposable setting tools to Repeat Precision customers.  It was foreseeable that Repeat Precision would rely on Diamondback's promise since the function of the disposable setting tools rely entirely on the power charge sold exclusively by Diamondback.

162.    In reasonable reliance on that promise, Repeat Precision entered into a long-term lease of a large warehouse to serve as the manufacturing facility, spent millions on necessary equipment, and hired employees to operate the manufacturing facility.

163.    Diamondback should be estopped from denying the enforceability of its promise to sell the power charges to Repeat Precision customers.

164.    However, if Diamondback is allowed to cut off the supply of power charges to Repeat Precision customers, Diamondback should be required to pay restitution and damages to Repeat Precision to compensate it for the value of its lost investments and lost profits, which were made in reliance on Diamondback's promises and assurances.

## VI.    REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF

165.    Repeat Precision incorporates by reference Paragraphs 1 through 164 above.

**A.    Diamondback's Sale of Power Charges**

166.    Repeat Precision seeks preliminary injunctive relief to preserve the status quo in the disposable setting tools market during the pendency of this lawsuit.  Federal courts are authorized to enter restraining orders and preliminary injunctions prohibiting violations of the antitrust laws "as shall be deemed just in the premises."  15 U.S.C. § 4.  Texas law is even more explicit on this point:

> Any person … whose business or property is threatened with injury by reason of anything declared unlawful in Subsection (a), (b), or (c) of Section 15.05 of this Act may sue any person … to enjoin the unlawful practice temporarily or permanently. In any such suit, the court shall apply the same principles as those

generally applied by courts of equity in suits for injunctive relief against threatened conduct that would cause injury to business or property.

Tex. Bus. & Com. Code § 15.21.  Repeat Precision hereby sues Diamondback for injunctive relief to restrain Diamondback from continuing its actual and threatened unlawful conduct in refusing to sell power charges to those who purchase products from Repeat Precision.

167.    Repeat Precision has a strong likelihood of success on the merits of its claims.  As detailed above, Diamondback has (a) actually refused to sell products (*i.e.* power charges) to customers who purchased disposable setting tools from Repeat Precision, (b) informed one or more Repeat Precision customers that the only way to obtain the power charges needed to run the disposable setting tool was to agree to purchase the tools exclusively from Diamondback, and (c) has threatened to continue such anticompetitive conduct.  Diamondback has also actually used and has threatened to continue using its market power and/or monopoly power in the power charge market, as the only supplier of power charges useable in disposable setting tools, to monopolize or attempt to monopolize the disposable setting tools markets.  All of this conduct is harmful to competition, and disruptive of natural market conditions.  Consumers and Repeat Precision have suffered actual injury as a result of this competitive harm, and will continue to do so if Diamondback is not enjoined.

168.    There is a substantial risk that the failure to grant a preliminary injunction will result in irreparable harm.  Without an injunction, Diamondback will be allowed to unlawfully manipulate and monopolize the market for disposable setting tools, thereby preventing consumers from choosing where to buy disposable setting tools.  Consumers would either be forced to buy products from Diamondback, or exit the market entirely.  Diamondback entered into the License because it had capacity issues, and an inability to manufacture disposable setting tools on a full scale basis.  Thus, if Diamondback is allowed to become the only competitor in

this market, consumers are likely going to be deprived of access to the disposable setting tools, which are cheaper and less risky than conventional setting tools, because of Diamondback's inability to meet consumer demand.  Monetary damages at the end of this lawsuit will be inadequate to remedy these harms to the market and consumers.

169.    The threatened injury to competition, the market, and consumers strongly outweighs any harm that Diamondback would suffer if a preliminary injunction is issued. Indeed, Diamondback would likely have no injury.   Under a preliminary injunction, Diamondback would actually sell more power charges than it otherwise would, thereby earning greater profits during this case.  The fact that Diamondback is taking economically irrational actions to sell less power charge products is a strong indicator of anticompetitive conduct designed to harm the disposable setting tool market.  The only harm Diamondback might suffer as a result of a preliminary injunction is that it would be hindered in its efforts to monopolize the disposable setting tools market.  This is not the type of harm that should weigh against an injunction to stop antitrust violations.

170.    Granting injunctive relief will not disserve the public interest.  To the contrary, injunctive relief will provide benefits to the public by preventing Diamondback from monopolizing the disposable setting tools market.   This will increase public access to an innovative product that is cheaper, and less risky to completion operations than conventional setting tools.

171.    Repeat Precision requests that the Court enjoin Diamondback, its officers, directors, employees, agents and all those acting in concert with Diamondback from engaging in the following conduct while this lawsuit is pending:

    a.    refusing to sell power charges to customers who purchase disposable setting tools from Repeat Precision or to contractors working for those customers;

b.    conditioning the sale of power charges on an agreement only to purchase disposable setting tools from Diamondback;

c.    unlawfully tying the sale of power charges to the purchase of disposable setting tools from Diamondback;

d.    imposing terms on the sale of power charges to Repeat Precision customers and their contractors that are materially different than the commercial terms Diamondback uses for sale to its own disposable setting tool customers; and

e.    retaliating against any customers because they choose to buy products from Repeat Precision.

Repeat Precision further requests that this injunction be incorporated into the Court's final judgment following a trial or judgment on the merits of this case.

## B.    Repeat Precision's Right to Have Power Charges Made Freed and Clear to Any Claims of Infringement by Diamondback

172.    Repeat Precision seeks preliminary injunctive relief to prevent Diamondback from interfering with Repeat Precision's contractual rights and efforts to have a third party make power charges for customers who purchase disposable setting tools from Repeat Precision.

173.    Repeat Precision has a strong likelihood of success on its contract and patent-based arguments to show that Repeat Precision has the right to make or have made power charges for use with disposable setting tools, free and clear of Diamondback's claims to patent rights on power charge technologies.  The License also allows Repeat Precision to assign or transfer its rights to others.  *See* Par. 13.10.  Diamondback has no justifiable basis under the parties' contracts or the relevant patents to interfere with Repeat Precision's exercise of its rights.

174.    Irreparable harm will occur if Diamondback is allowed to interfere with Repeat Precision's exercise of its rights.  Diamondback's actions have created uncertainty in the market for disposable setting tools, causing customers to question whether power charges will be available if they purchase tools from Repeat Precision.  Repeat Precision seeks to exercise its rights to have a third party make power charges for Repeat Precision customers to remove the

uncertainty in the market, and to prohibit Diamondback from unlawfully manipulating or suppressing the market as it has previously done by controlling and withholding access to power charges.

175.    The balance of equities weighs strongly in favor of injunctive relief.  Repeat Precision did not want to get involved in the power charge market.  Moreover, its original intent was to work with Diamondback to increase the sale of Diamondback's power charges by recommending them for use with Repeat Precision's disposable setting tool.  Diamondback unilaterally caused the uncertainty in the market when it engaged in anti-competitive conduct to retaliate against Repeat Precision for filing suit to enforce its License against Diamondback. Thus, Diamondback has no legitimate basis to complain about any alleged harm to its own interests as a result of injunctive relief that protects the market against further harm from Diamondback's anticompetitive conduct.

176.    The public interest will best be served by granting injunctive relief to protect the market against Diamondback's conduct while this case is pending.

177.    Repeat Precision requests that the Court enjoin Diamondback, its officers, directors, employees, agents and all those acting in concert with Diamondback from engaging in the following conduct while this lawsuit is pending:

    a.    interfering with Repeat Precision's rights to contract with third parties to make and sell power charges that may be used by customers who buy disposable setting tools from Repeat Precision; and

    b.    contacting, threatening, or discouraging any person from making power charges under any agreements with Repeat Precision, including, but not limited to, asserting claims that such activities would infringe Diamondback's patents.

Repeat Precision further requests that this injunction be incorporated into the Court's final judgment following a trial or judgment on the merits of this case.

**C.    Bond**

178.    Repeat Precision is willing to post a bond to support its request for injunctive relief.   Repeat Precision submits that $1,000 would be an appropriate bond given that the requested injunction would *increase* Diamondback's sales and profits during the time period while the injunction is in place.

## VII.    PRAYER FOR RELIEF

For the reasons stated, Repeat Precision prays for judgment against Diamondback, including the following relief:

(1)    A judgment that Diamondback has breached the License and its implied contracts with Repeat Precision;

(2)    A judgment and order requiring Diamondback to pay Repeat Precision its actual and compensatory damages resulting from Diamondback's breach, together with Repeat Precision's attorney's fees;

(3)    A judgment that Diamondback has directly and indirectly infringed and is directly and indirectly infringing one or more claims of the '035 Patent under all applicable provisions of Title 35 of the United States Code;

(4)    A judgment and order finding that Diamondback has willfully and is willfully infringing one or more claims of the '035 Patent;

(5)    A judgment and order requiring Diamondback to pay Repeat Precision its damages resulting from Diamondback's infringing activities and treble damages as provided by 35 U.S.C. § 284;

(6)    A judgment and order finding this to be an exceptional case and requiring Diamondback to pay the costs of this action (including all disbursements) and attorneys' fees as provided by 35 U.S.C. § 285;

(7)    A judgment and order that Diamondback, its officers, directors, employees, agents and all those acting in concert with Diamondback be enjoined, pursuant to 35 U.S.C. § 283, from all future activities directly infringing the '035 Patent, and/or inducing or contributing to the infringement of the '035 Patent;

(8)    A judgment that Diamondback has violated federal and state antitrust laws, including Section 1 of the Sherman Act (15 U.S.C. §1), Section 2 of the Sherman Act (15 U.S.C. §2), Section 3 of the Clayton Act (15 U.S.C. §14), and Tex. Bus. & Com. Code §15.05(b) & (c);

(9)     A judgment and order requiring Diamondback to pay treble damages as provided for under 15 U.S.C. § 15(a) and Tex. Bus. & Com. Code §15.21(a)(1);

(10)    A judgment that Diamondback has tortiously interfered with Repeat Precision's existing and prospective contracts and business relationships;

(11)    A judgment and order requiring Diamondback to pay Repeat Precision its actual and compensatory damages resulting from Diamondback's tortious interference;

(12)    A judgment and order requiring Diamondback to pay exemplary damages due to Diamondback's tortious interference;

(13)    A preliminary injunction as set forth in paragraphs 165-177 above;

(14)    A judgment and order that Diamondback, its officers, directors, employees, agents and all those acting in concert with Diamondback be enjoined, from (a) refusing to sell power charges to customers who purchased products from Repeat Precision or to contractors working for those customers, (b) conditioning the sale of power charges on an agreement only to purchase disposable setting tools from Diamondback, (c) unlawfully tying the sale of power charges to the purchase of disposable setting tools from Diamondback; (d) imposing terms on the sale of power charges to Repeat Precision customers or their contractors that are materially different than the commercial terms Diamondback uses for sale to its own customers, and (e) retaliating against any customers because they choose to buy products from Repeat Precision;

(15)    A judgment declaring that:

    a.      Repeat Precision has the right and license to make, have made, import, use or sell dry-firing power charges without infringing Diamondback's patents or other legal rights;

    b.      the License grants Repeat Precision the right to make, have made, use, offer for sale, sell, or important in the Territory, the power charges that are necessary or useful for making and using disposable setting tools;

    c.      the Licensed Patents under the License include the '382 and '054 Patents;

    d.      Diamondback does not have the right to exclude Repeat Precision from the market for power charges for disposable setting tools; and

    e.      Repeat Precision's rights under the License include the right to have a third-party make and sell the necessary power charges for use by Repeat Precision's customers, free and clear of any claim of infringement by Diamondback that such activities infringe the Licensed Patents, including the '382 and '054 Patents;

(16)    An Order compelling Diamondback to continue for the Term of the License to sell power charges to Repeat Precision and or its customers who have or will purchase products from Repeat Precision upon terms that are not materially different than the terms in existence when the License was executed;

(17)    A judgment and order that Diamondback, its officers, directors, employees, agents and all those acting in concert with Diamondback be enjoined, from (a) interfering with Repeat Precision's rights to contract with third parties to make and sell power charges that may be used by customers who buy disposable setting tools from Repeat Precision; and (b) contacting, threatening, or discouraging any person from making power charges under any agreements with Repeat Precision, including, but not limited to, asserting claims that such activities would infringe Diamondback's patents;

(18)    A judgment and order awarding Repeat Precision recovery of its attorneys' fees under Chapter 38 of the Tex. Civ. Prac. & Rem. Code;

(19)    A judgment and order requiring Diamondback to pay Repeat Precision its costs, prejudgment and post judgment interest; and

(20)    Such other and further relief as the Court deems just and equitable.

Date:  February 4, 2019                    Respectfully submitted,


                                           */s/ W. Scott Hastings*
                                           W. Scott Hastings
                                              Texas State Bar No. 24002241
                                              *shastings@lockelord.com*
                                           Charles E. Phipps
                                              Texas State Bar No. 00794457
                                              *cphipps@lockelord.com*
                                           Susan E. Adams
                                              Texas State Bar No. 24059354
                                              *suadams@lockelord.com*
                                           Anna K. Finger
                                              Texas State Bar No. 24105860
                                              *anna.k.finger@lockelord.com*

                                           LOCKE LORD LLP
                                           2200 Ross Avenue, Suite 2800
                                           Dallas, Texas  75201
                                           (214) 740-8000 Telephone
                                           (214) 740-8800 Facsimile

                                           ATTORNEYS FOR REPEAT PRECISION, LLC